| | |
|---|---|
| _____ ) | |
| JOHN DOE, ) | |
| Plaintiff ) | |
| ) | CIVIL ACTION NO.: 13-11740 |
| ) | |
| v. ) | |
| ) | |
| WILLIAMS COLLEGE, ) | |
| Defendant ) | |
| _____) | |

### AMENDED VERIFIED COMPLAINT AND REQUEST FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff, John Doe, through counsel, alleges as follows:

### NATURE OF THE ACTION

This is an action for preliminary and permanent injunctive relief and damages arising from the Defendant Williams College's wrongful expulsion of the Plaintiff resulting from the application of "disciplinary procedures" that were in violation of the College's rules and policies, the requirements of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (2011)("Title IX") and its implementing of regulation at 34 C.F.R. 106, and principles of due process and fundamental fairness.

### PARTIES

1. Plaintiff John Doe is a resident of another state.

2. Defendant Williams College ("College") is a private, non-profit college located in Williamstown, Massachusetts.

3. Plaintiff was a full time student at the College from September 2009 until his expulsion from the College on January 24, 2013.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331, and over his state claims under § 1332, as the parties are diverse and the amount in controversy exceeds $75,000.

5. This Court has personal jurisdiction over Defendant because its principal place of business is within the Commonwealth.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendant resides in Berkshire County.

## FACTUAL ALLEGATIONS

### I. Background and Relationship of the Parties

7. Established in 1793, the College is a private, non-profit school granting undergraduate degrees.

8. Mr. Doe was a full-time student at the College from September 2009 until his expulsion on January 24, 2013.

9. Twenty-one years old at the time of his expulsion, he was a junior in satisfactory academic standing.

10. On or about November 8, 2012, another student at the College, "Complainant[1]," reported and on November 11, 2012, made a formal complaint against Mr. Doe with the College authorities. Complainant never lodged a criminal complaint against Mr. Doe.

11. Complainant admitted that Mr. Doe had asked for and received consent to engage in sexual intercourse, but claimed that in the course of such intercourse he exceeded the bounds of what she consented to.

---

[1] Pursuant to an Order of this Court dated September 5, 2013 granting Plaintiff leave to proceed pseudonymously and for Protective Order, and by agreement of the parties, Plaintiff refers to the complaining student throughout the Amended Complaint as "Complainant."

12. Mr. Doe, in turn, alleged that all of the sex was consensual and that he did not knowingly or intentionally engage in acts beyond those to which Complainant consented.

13. Through the disciplinary procedures outlined below, the College conducted a hearing on or about January 20, 2013, which resulted in Mr. Doe's expulsion from the College.

**II. Relevant Disciplinary Policies and Procedures as set forth in the Student Handbook**

14. The College's Disciplinary Procedures are published in the 2012-2013 College Handbook ("Handbook"), summarized and excerpted in relevant part as follows:

> The Office of the Dean of the College investigates alleged breaches of good conduct and of College laws and regulations. A student charged with such a breach will be informed by a dean of the alleged violation. Any student who is charged with an offense shall have a reasonable opportunity to make his or her defense in a respectful manner to a dean, or to the Faculty-Student discipline committee if the matter comes before that Committee.
>
> …[A] dean may impose such penalties as he or she deems appropriate and consistent with the College laws and regulations. The penalties a dean may consider include but are not limited to: disciplinary warning…; disciplinary probation for a specified period…; payment of a fine or restitution; suspension for a specified time; or permanent expulsion.
>
> When a dean decides a disciplinary case, he or she normally writes to inform the accused student of the decision and of any penalties; and of cases that involve violations of individual rights or injury to Williams students, staff, faculty or to their property, to explain the decision to those aggrieved. The accused student, and any aggrieved Williams student, staff, or faculty, must respond in writing to the dean, within one week, either accepting the dean's decision and penalties or asking to appeal the case to the Discipline Committee.
>
> …

Handbook at 139.

15. The Appendix to the Handbook sets forth procedures governing hearings by the Discipline Committee, excerpted in relevant part as follows:

> Appeals by Students Accused of Misconduct:
>
> *Overview*

3

…A student who wishes to contest the factual basis of a Dean's disciplinary decision or the appropriateness of a sanction may appeal the decision within ten days after receiving the Dean's letter formally informing the student of the decision. Appeals are resolved by the Discipline Committee, which consists of eight student members elected by their peers, eight faculty members appointed by the Dean of the Faculty, and the Dean of the College *ex officio*. An appeal is initiated when the appellant informs both the Dean and the Chair of the Discipline Committee that he or she wishes to appeal. The Chair works with the Dean to convene a hearing by a panel drawn from among the members of the committee. Hearings are confidential. The panel hears the case in its entirety and reaches an independent decision as to whether the student has violated the community's standards of conduct or College policy and, if necessary, determines an appropriate sanction. The panel makes its decisions without reference to civil or criminal court proceedings. Decisions of the Panel are final an appellant cannot afterwards choose to revert to the Dean's initial decision.

*Hearings*

A hearing should be held as soon as practicable. The appellant is apprised in writing by the Dean of the case to be made against him or her and of the witnesses who will appear against him or her, and is allowed a reasonable amount of time to prepare a defense and solicit witnesses on his or her behalf. The Chair appoints a hearing panel, drawing four students and four faculty from among the members of the Discipline Committee; the Dean attends *ex officio* but does not participate in the panel's deliberations.

If the appellant feels that a member of the panel cannot hear the case objectively, he or she may challenge that member's participation in the hearing. Members of the committee may ask to be recused if they feel unable to judge the case objectively. Acquaintance, ties of friendship, or previous knowledge of the case alone are not in themselves sufficient grounds for challenge or recusal. The Chair decides if there are sufficient grounds for challenge or recusal. If the Chair is challenged, the next most senior faculty member of the committee decides the challenge and assumes the chair if the challenge is agreed to. If challenges or recusals are accepted, the Chair draws alternates from among the members of the Discipline Committee; it is not necessary to have equal numbers of student and faculty to constitute a panel.

The appellant may be accompanied by an advisor drawn from among current faculty, staff, and students of the College; attorneys are not permitted to attend hearings. The appellant may consult with his or her advisor at any time during the hearing, but the advisor may not address the committee or witnesses. **If an aggrieved party appears as a witness, he or she may also be accompanied by an advisor, subject to the same conditions.**

The conduct of the hearing and decisions regarding procedure are at the discretion of the Chair, who is free to act flexibly **within the confines of good order and fairness**. The case against the appellant is presented by the Dean of the College (or by a designee), who may call witnesses and present evidence as deemed appropriate

by the Chair.  ***Both the appellant and the members of the panel may address questions to the Dean or to witnesses.  The appellant may challenge any evidence adduced by the Dean or presented by witnesses.  No witness may give testimony or present evidence in the absence of the appellant.***  However, the Chair may choose to accommodate any witness's concern for personal safety or fear of confrontation by allowing testimony to be given live from a remote location or in writing, or by facilitating indirect questioning, ***so long as the appellant's right to pose questions to the witness is preserved***.  The appellant may call witnesses and present evidence pertinent to the case.  A limited number of character witnesses on behalf of the appellant are permitted, but it should be noted that the panel is interested primarily in the facts of the case, rather than in the appellant's general moral character.  The Dean and members of the panel may address questions to the appellant's witnesses.  Witnesses usually appear one at a time but may be recalled by the Dean, by the appellant, or by the panel to answer additional questions and may be informed of the testimony given by other witnesses.

***After all evidence and testimony have been presented, the appellant is given a final opportunity to address the panel***.  ***The panel, excluding the Dean, retires to deliberate.***  The panel resolves three issues: whether the conduct of which the appellant is accused is a violation of College standards or policy; whether there is a preponderance of evidence that the appellant committed the conduct in question; and, if necessary, what sanction is to be imposed as a consequence.  The panel has available to it the full range of disciplinary sanctions, including, but not limited to, a letter of warning, a term of disciplinary probation, suspension from the College, and expulsion from the College.  A majority of one-half plus one of panel members voting is required for a decision.  A majority of three-quarters of members voting is required for expulsion from the College.  The Chair of the panel informs the appellant, the Dean, and any aggrieved party of its decision.  The Dean is responsible for enforcing any sanction imposed by the panel.

The appellant or the Dean may petition the Discipline Committee for reconsideration only on the basis of grossly improper procedure or dispositive new evidence not available at the time of the hearing.  The committee will decide whether to reconsider by majority vote.  A decision to reconsider reinitiates the appeals process in its entirety.

Handbook at 175-176 (emphasis added).

## III. Bias in the College's Sexual Misconduct Policy

16. The College Code of Conduct defines Sexual misconduct as follows:

Non-Consensual Sexual Intercourse:  Any sexual intercourse (anal, oral or vaginal); however slight; with any object; by a man or a woman upon a man or a woman; without effective consent.

…

Consent means that at the time of the sexual contact, words or conduct indicate freely given approval or agreement, without coercion, by both participants in the sexual contact. Both parties have the obligation to communicate consent or the lack of consent. A verbal "no" (no matter how indecisive) or resistance (no matter how passive) constitutes the lack of consent. In addition, consent once given may be withdrawn at any time. If consent is withdrawn, the other party must immediately stop whatever sexual contact is occurring.

An individual is unable to give consent if he or she is:
- Substantially physically or mentally impaired by alcohol or drugs
- Forced or threatened
- Physically incapable of resisting assault, asleep, or unconscious.

Unless an individual is substantially physically or mentally impaired, consent while under the influence of alcohol or drugs is valid consent.

Handbook at 138, 184.

17. The College policy on Sexual Misconduct in and of itself is biased as framed, shown by the word choice in connection with reporting alleged sexual misconduct: Statement of the ***Victim's*** Rights. *See* Handbook Appendix at 185-186. (emphasis added).

18. Use of the word "victim," as opposed to a value-neutral word such as "accuser" or "complainant" inescapably presupposes the guilt of the accused from the very outset, prior to the commencement of any proceedings. Such language bespeaks an institutional climate of bias against the accused, who as a result must prove his innocence as opposed to having the presumption of innocence.

19. The College's bias is further illustrated by the long list of Victim's Rights, twelve in all, as contrasted by the mere three rights enumerated in the Statement of the Accused's Rights:

- **The right to be treated with respect by College officials**
- The right not to be discouraged from reporting by College officials
- The right to be informed of the outcome and sanction of any disciplinary process involving sexual assault
- The right to be informed of their options to notify proper law enforcement authorities, including on-campus and local police, and the option to be assisted by campus authorities in notifying such authorities, if the student so chooses

- The right to be notified of available counseling, mental health or student services for victims of sexual assault both on campus and in the community
- The right to notification of and options for, and available assistance in changing academic and living situations after an alleged sexual assault incident, if so requested and if such changes are reasonably available
- **The right not to have irrelevant prior sexual history admitted in a campus hearing**
- The right to have the charges treated properly through the disciplinary process, including the right to appeal
- The right to a campus no contact order against another student who has engaged in or threatens to engage in stalking, threatening, harassing or other improper behavior that presents a danger to the welfare of the complaining student
- **The right to have complaints of sexual misconduct responded [sic] quickly and with sensitivity**
- **The right to have sexual assault reports investigated and appropriately resolved/addressed by the College.**
- The right to be free from retaliation of any sort for bringing charges or making a complaint of sexual misconduct.

Handbook at 185-186 (emphasis added).

20. In contrast, the Statement of the Accused's Rights includes only the following:

- The right to timely notices of charges, including the nature of the charge;
- The right to have the charges treated properly through the disciplinary process, including the right to appeal; and
- The right to access campus resources for medical, counseling, and advisory services.

*Id.* at 186.

21. The accused do not enjoy the "victim" rights to: (i) be treated with respect by College officials; (ii) not  have irrelevant prior sexual history admitted in a campus hearing; (iii) have complaints of sexual misconduct responded to quickly and with sensitivity; or (iv) have sexual assault reports investigated and appropriately resolved/addressed by the College.  *See id.*

22. During the 2011-2012 school year, six students were subject to disciplinary proceedings resulting from allegations of sexual assault.  All six were found guilty.  Five were suspended for a period of time ranging from one to five semesters.

23. On information and belief, the sexual misconduct policy has only been enforced against male students at the College.

**IV. Bias in Application of the College's Policies and Grossly Improper Procedure.**

   **A. Bias before and during the course of the Investigation**

24. Sometime during the week of November 5, 2012, without prior notice of Complainant's complaint, Mr. Doe was denied access to Mission Park, the building that contains her dormitory and also the dining hall in which Mr. Doe regularly ate. Mr. Doe discovered he had been barred from Mission only when his card swipe access was disabled upon attempting to enter the building for lunch. Only later that same day was he finally contacted by security and informed of Complainant's report.

25. On November 8, 2013, the College issued a No Contact Order, signed by Complainant and applicable to both Complainant and Mr. Doe, forbidding Complainant and Mr. Doe to have any contact with each other, barring Mr. Doe from Mission Park, including the dining hall, and imposing confidentiality on both parties, stating that: "…the details of this case may not be discussed or shared by any means with anyone."

26. The No Contact Order further states that "…any violation of this Order will result immediate [sic] disciplinary action up to and including separation from the College."

27. During the investigation, Complainant admitted to having twice violated the no contact/confidentiality order, having discussed her complaint with two student "Junior Advisors," including with Mr. Doe's friend and teammate.

28. Twice during the same week after football practice, Mr. Doe was followed by College Safety and Security Supervisor Alison Warner in a Security car. Mr. Doe observed that

her car was parked on the side of the tennis courts and as soon as he drove past her car she followed him.

29. Once he bypassed Mission Park the car departed in a different direction. These episodes illustrate that based wholly on Complainant's initial report, the College treated Mr. Doe as if he was a stalker and a dangerous individual, before even informing Mr. Doe of such report, let alone undertaking any investigation.

30. The College continued to perpetuate bias once the investigation was underway, as illustrated by the stark contrast between the interviews of Complainant and Mr. Doe.

31. Complainant was interviewed on two occasions. She was first interviewed on November 16, 2012. Whereas at the beginning of her interview, Director of Campus Safety and Security David Boyer told her that she can take a break, stop the interview and restart on another day, he said no such thing to Mr. Doe.

32. Mr. Boyer in fact allowed Complainant to suspend the interview almost immediately and recommence, upon information and belief, a week later, while Mr. Doe was given no such opportunity. Similarly, toward the end of Complainant's interview Mr. Boyer apologized to her for asking her to repeat her written statement, for "drag[ging you through all that again. It shouldn't have happened."

33. The faculty and staff interviewing Complainant asked numerous leading questions, suggesting answers that assumed Mr. Doe's guilt. On certain instances when an answer was not sufficiently damning the interviewers persisted, suggested negative answers, and even praised the Complainant when she supplied the desired answer, as illustrated in relevant part in the following questions and exchanges as follows:

**Director Boyer:** When you went into the room, was there some point when he was no longer a nice guy, a guy that could be trusted? Was there some point that that happened immediately when you went into the room?

…

**Director Boyer:** So he continued to take to advance the situation farther (sic) than you were comfortable with and it continued to escalate. Correct?

…

**Director Boyer:** Did he penetrate you when he attempted or was it attempted anal sex or did he…

…

**Director Boyer:** And you think that was intentional.

…

…Have you heard anything, has anyone told any stories about [Mr. Doe], have you heard anything since then.

…

**Supervisor Warner:** Did he seem angry at all in any way?

**Complainant:** not violent certainly, but um frustrated.

**Supervisor Warner:** more or less like he wasn't getting what he wanted or what he had hoped to get or so.

**Complainant:** yeah.

**Director Boyer:** In your statement D[.], where he was just turning the light on and off for short periods of time why do you think he was doing that?

**Complainant:** I have no clue, I don't know.

**Director Boyer:** It almost sounded like he was trying to make it even harder on you.

**…**

**Director Boyer**: If somebody you know mentioned [Mr. Doe's] name, leaving the sexual assault out of it how would you describe him as a person.

**Complainant**: Sexual assault aside, I don't really know him as a person to be honest.

**Supervisor Warner**: But your observation that night.

**Complainant**: Um well before the assault happened I thought he was perfectly [sic] cordial normal person.

…

**Director Boyer**: …how would you describe him to caution the other person.

> **Complainant**: …he was an asshole, he was very manipulative he shouldn't have done that to me and he knew that throughout the entire night that he was in a position of power over me because, not just because he's a male but because he's an upper classmen [sic], because he knew I was a freshmen [sic] and I didn't know where I was going and that when I said no, he should have taken that into consideration and just let it be.
>
> **Director Boyer**: *Good job*. Ok, I think we are all set… (emphasis added)
>
> …
>
> **Director Boyer**: …*it was important for us hear[sic] how you feel and how you would warn someone*. (emphasis added)

**Transcript of Interview of Complainant**

34. During the second interview, despite Complainant's two admitted violations of the no contact/confidentiality order, Director Boyer stated that there would be no repercussions as the order was "for [her] comfort," but stated with regard to Mr. Doe that:

> "We're going to reinforce the No Contact order and the Confidentiality portion of that just to make sure that he doesn't cause ***any further problems*** for himself because that's what would happen if did [sic] breach the confidentiality."

(Emphasis added).

35. Moreover, even though Complainant stated that prior to the incident in question she did not know Mr. Doe well, Director Boyer characterized Mr. Doe's similar statement as "trying to minimize anytime he had been around [Complainant]…," questioning his honesty even before his interview.

### B. Bias in the Disciplinary Procedures and Sanction

#### 1. Dean's Decision

36. As with the investigation, the Dean's decision, hearing and deliberations were themselves rife with bias and grossly improper procedure that doubtless influenced the outcome.

37. Along with the interviews of Mr. Doe, Complainant, and other students, Dean Bolton also considered Mr. Doe's previous disciplinary record, which involved no formal disciplinary sanctions.  Nevertheless, the Dean determined that "taken together they

11

strike me as demonstrating a pattern of disrespectful and damaging behavior in a number of contexts." Mr. Doe had no opportunity to discuss the incidents or place them into context.

38. On December 15, 2012, Dean Sarah Bolton informed Mr. Doe of her decision finding a preponderance of the evidence supporting the allegation of sexual assault, suspending him for three semesters.

39. Mr. Doe timely appealed the decision and requested a hearing before the Disciplinary Committee.

<u>2. Hearing before the Disciplinary Committee</u>

40. In addition to the published procedures, Discipline Committee Chair Cheryl Shanks ("Chair" or "Dr. Shanks") made the following specific representations to Mr. Doe in a letter dated January 2, 2013 ("1/2/13 Shanks Letter") prior to the Committee Panel's ("Panel") hearing:

- Because our committee focuses on actions rather than on character, and on the immediate actions in question rather than any in the past or future, we want to hear witnesses who can attest to the facts in dispute and consider character witnesses' testimony not to be pertinent.

- Once everyone has said, and asked, what needs to be said, both you and the Dean will be excused. The committee will stay in the room to deliberate, and relay its decision to you immediately after it is reached.

- All of the rules that apply to you…apply equally to all parties. For example, I explained that you are not to bring historical or character witnesses; neither may other parties.

- In addition, I will make known to you anything that the Dean informs me of, e.g. a list of documents she wishes to introduce, and will share with her the same information from you.

- In sum, procedures apply equally…none of this is secret.

41. Also prior to the hearing, Dean Bolton sent a letter to Mr. Doe dated January 9, 2013 ("1/9/13 Bolton Letter") listing and attaching copies of relevant materials and evidence. The list included: i) the statements made to Campus safety by six students; ii) transcripts of the interviews with Complainant and Mr. Doe; iii) a written statement by Complainant; and iv) copies of the no contact orders.

42. Consistent with the 1/2/13 Shanks letter indicating that historical and character evidence may not be used, the list did not include Mr. Doe's prior disciplinary record or indicate that other materials might be used in the hearing.

43. The letter further stated that the documents are confidential and must not be shared, with narrow exceptions, reiterated the no contact order, and that violation of any of the rules would result in additional disciplinary sanctions.

44. During the hearing, Dean Bolton and the Chair fostered an atmosphere of overzealous sympathy toward Complainant, abandoning the role of impartial fact-finders and likewise compromising the Panel's impartiality.

45. As with the security interview, Dean Bolton asked Complainant highly leading questions, such as "tell us about how this event has adversely affected your school work."

46. While the Complainant (who was located off-site pursuant to appellate disciplinary procedure) was permitted to speak with the Director of Health Services during questioning, Mr. Doe was prohibited from discussing anything with his advisor, Williams faculty member Aaron Kelton, who accompanied Mr. Doe during the hearing.

47. Mr. Doe was also prevented from asking Complainant a question  designed to show that her issues with school work and the hearing were unrelated, having been pressured by the Chair in presence of the Panel to rescind the question.

48. This instance set a troubling precedent for the remainder of the hearing: the Panel was encouraged to view any defense by Mr. Doe as insensitivity to the Complainant leaving no room for an equitable, rational, fact-based debate.

49. As a result, Mr. Doe was essentially forced by the Chair to forgo challenging Complainant's assertions from fear of seeming insensitive, Complainant was implicitly labeled a "victim," and, in line with the College's policies articulating sexual misconduct Mr. Doe's guilt was assumed.

50. Dean Bolton further biased the proceedings by exhorting the Panel not to consider evidence in Mr. Doe's defense. While questioning one of Complainant's witnesses, Mr. Doe asked whether Complainant had mentioned one of the key allegations of her complaint, which the witness denied. Afterward Dean Bolton addressed the Panel outside her turn to speak and said "Let's keep in mind she [Complainant] was going through a lot at the time and could've resulted in not remembering everything."

51. When a panel member skeptically asked Dean Bolton what caused her to decide that three semesters was an appropriate sanction, she responded that this involved more than one sexual misconduct violation, cited a statistic about recidivism, and stated that it is her job to protect the students.

52. Despite the prohibition against admission of the Complainant's irrelevant sexual history, moreover, the Chair allowed evidence of the Complainant's alleged virginity prior to the night in question to be admitted into evidence.

53. Such revelation, in turn, prompted a number of irrelevant questions surrounding virginity that attacked Mr. Doe's integrity, sidetracked heavily from the facts, and served only to make the Panel's decision emotional rather than fact-based.

54. Likewise, when it was Mr. Doe's turn to be questioned his guilt and dishonesty were further assumed through a pattern of coercive questioning.

55. Subsequent to the conclusion of the hearing, despite the Chair's written representation that Committee Panel members would remain in the room to deliberate, the decision took more than a week and a half to issue.

56. During this time, Panel members were recalled on numerous occasions as they had not yet made a decision, and given additional information by Dr. Shanks in the form of Mr. Doe's prior disciplinary records.

57. The Chair gave the documents to the Panel on different days, strongly suggesting that the required number of Panel members did not initially favor expulsion and needed to be convinced. The troubling implication is that the Chair deviated from the standard practice of deliberating and deciding on the same day in order to influence the outcome in a particular direction.

58. The decision of the Chair to prolong the deliberation process for more than a week created the opportunity for Panel members to be influenced by factors not heard by Mr. Doe or addressed in the proceeding—they may have seen him on campus or in class, potentially heard or asked about him, or even perhaps researched his background on the internet.

59. Mr. Doe encountered three of the Panel members on campus during the one and a half weeks of deliberation. Although two of the encounters were in passing, one was with Assistant Professor Christi Kelsey, strength and conditioning coach, who was present during Mr. Doe's off-season workouts in the gym.

60. These interactions show that the clear potential existed for compromising impartiality and that the College was negligent in allowing any outside interactions to occur, whether as between Panel members, such members discussing the case with third party sources, or making judgments of Mr. Doe through casual interactions.

61. The Chair provided documents related to Mr. Doe's alleged prior disciplinary matters to the Panel after the close of evidence, in clear violation of the Disciplinary Appeals Procedure, which as set forth above, forbids the presentation of evidence outside the presence of the appellant, and further provides that the appellant is entitled to address the panel *after* all of the evidence has been presented.

62. Mr. Doe had no notice or opportunity to respond to such records (for which in any event he had never been sanctioned), nor the chance to place the alleged events in context. Indeed, the 1/2/13 Shanks letter indicated that such records were neither pertinent nor permissible, and the 1/9/13 Bolton letter did not include them on a list of "materials and evidence relevant to your case."

63. Further, in her opening remarks, while Dean Bolton briefly mentioned the existence of the security reports as she had alluded to them in her sanction letter to Mr. Doe, she indicated that she would not detail such reports as she also was making privileged any outside irrelevant information regarding Complainant.

64. Such information appears to have been the motivating factor behind the Panel's decision to increase Mr. Doe's sanction from suspension to expulsion, as the decision letter states that the findings with respect to Complainant's allegations were sufficient to support a lengthy suspension, then goes on to discuss the alleged prior disciplinary issues as a prelude to the decision to expel, rather than suspend, Mr. Doe, stating:

> "Taken together with the assault on [Complainant], these reports paint a disturbing picture of aggressive boundary-crossing and physical violence."

65. During Mr. Doe's final meeting with the Chair and Director Boyer to receive the hearing decision of expulsion, Dean Bolton was not present but instead Dean David Johnson, who, to Mr. Doe's knowledge had no prior involvement in the case.

66. Upon information and belief, Dean Johnson was inappropriately given an opportunity to weigh in with his own judgment. Moreover, upon information and belief Dean Johnson has stated to another faculty member that complainants generally get the benefit of the doubt in these cases.

67. Mr. Doe (or others on his behalf) paid over two years' tuition and fees to the College, totaling approximately $24,000.

68. Without completing his undergraduate degree, Mr. Doe cannot apply to graduate school, nor does he have any reasonable prospects of employment commensurate with his education. As a result, Mr. Doe faces catastrophic present and future economic loss.

69. Further, should expulsion for "sexual misconduct" appear on his disciplinary record, Mr. Doe may not even be able to enroll at another institution, let alone one of comparable quality, in order to repeat some of his requirements and complete his college degree.

**COUNT I**
**Violation of 20 U.S.C. § 1681(Title IX)**

70. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

71. Title IX states in pertinent part: "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance..." 20 U.S.C. § 1681(a).

72. The College receives federal funding under Title IX, 20 U.S.C. §§ 1681-1688 (2011).

73. As a Title IX recipient, the College is required to comply with the requirements of Title IX as well as those of the regulations promulgated thereunder by the Department of Education.

74. These regulations require each school receiving Title IX funds to "adopt and publish grievance procedures providing for the **_prompt and equitable_** resolution of student ... complaints alleging any action which would be prohibited by Title IX or its regulations." 34 C.F.R. 106.8 (2010). (emphasis added).

75. The regulations further require that "a school's procedures must accord **_due process to both parties_** involved ..." (emphasis added). *See* Title IX (2001) "Revised Sexual Harassment Guidance" at 22 (notice of publication at 66 Fed. Reg. 5512, January 19, 2001).

76. The College's sexual misconduct and disciplinary policies, as written and as implemented in Mr. Doe's case, are not equitable and do not accord due process to the accused.

77. On information and belief, the fundamental unfairness that imbued Mr. Doe's disciplinary process, as well as the erroneous outcome, are part of a pattern of decision-making that discriminates against male students accused of sexual misconduct.

78. As a result of the College's enforcement of this policy and its failure to comply with the other requirements under Title IX with respect to its disciplinary procedures, Mr. Doe has been denied the benefits of the College's educational program in violation of Title IX.

## COUNT II
### Breach of Contract

79. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

80. Plaintiff and the Defendant College had a contractual relationship, either express or implied. Such contract was formed on the one hand by Mr. Doe's payment (or payment made on his behalf) of tuition and fees to the College and on the other, by the terms contained in the Student Handbook, the College Catalogue, and other College materials.

81. Mr. Doe had a reasonable expectation that the College would adhere to the terms of such contract, as contained in the Disciplinary Procedures and other College materials.

82. Mr. Doe further had a reasonable expectation that the College's stated procedures would comply with the requirement under the Title IX regulations to provide an equitable process for adjudicating claims of sexual misconduct and to ensure due process to both the accuser and the accused.

83. The College breached the terms of its contract with Mr. Doe by violating its Disciplinary Procedures as set forth above, and in particular, by: (i) failing to give Mr. Doe timely notice of the report against him before disabling his key card and limiting his freedom and access to campus facilities; (ii) tailing his vehicle on two occasions without cause; (iii) Conducting his and Complainant's interviews in a highly disparate manner and repeatedly suggesting negative testimony to Complainant; (iv) admitting irrelevant and highly prejudicial testimony about Complainant's alleged virginity at the hearing; (v) failing to promptly issue a decision; (vi) allowing the Panel to leave and return to deliberations several times over the course of a week and a half; (vii) supplying additional evidence to the Panel on more than one occasion after the close of evidence and after it had temporarily suspended deliberations, to which Mr. Doe had no opportunity respond or place into context; and (viii) the Chair's admission that she did

not place Mr. Doe's prior disciplinary incidents into context but gave them to the Panel because they "troubled" her.

84. Defendant College's procedural violations, acts and omissions as described herein rendered the proceedings unfair, contravening the specific Handbook provision entitling students to a process which is "***within the confines of good order and fairness***."

85. Such failures combined to cause Mr. Doe significant prejudice in that he was denied an even-handed assessment of the facts, resulting in his expulsion.

**COUNT III**
**Breach of the Implied Covenant of Good Faith and Fair Dealing**

86. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

87. Massachusetts law recognizes an implied covenant of good faith and fair dealing in all contracts, either express or implied.

88. By the conduct alleged herein, the College has breached the implied covenant of good faith and fair dealing, and caused harm to Mr. Doe.

**COUNT IV**
**Unjust Enrichment**

89. Plaintiff re-alleges and reasserts the allegations set forth above as if fully set forth herein.

90. In the alternative, should this Court find no remedy at law available to Plaintiff, Plaintiff pleads Unjust Enrichment.

91. The college received a substantial monetary benefit, approximately $24,000 in the form of more than two years' tuition and fees paid by Mr. Doe or on his behalf before disciplinary proceedings commenced.

92. As set forth above, due to gross and numerous violations of its Disciplinary Procedures and its policy regarding access to and preservation of the record, the process by which the

College found Mr. Doe responsible for the alleged acts was inherently flawed and fundamentally unfair, causing Mr. Doe significant prejudice.

93. As a result, Mr. Doe is left expelled from the College and will not complete his degree or receive his diploma.

94. For the reasons set forth herein, under the circumstances it would be inequitable for the College to retain the tuition it has received from the Doe family.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff John Doe requests that the Court:

i. Enjoin the College from enforcing its order of expulsion and Order the College to readmit Mr. Doe;

ii. Order the College to expunge the incident from College records and to represent his good standing to third parties;

iii. Award damages for the harm to Mr. Doe arising from the Defendant's improper conduct;

iv. Award attorney's fees and costs pursuant to 42 U.S.C. § 1988(b) (relating to Title IX), or pursuant to any other statute or common law doctrine providing for such award;

v. Award prejudgment interest; and

vi. Award such other legal or equitable relief as may be appropriate.

Respectfully submitted,
JOHN DOE
By his attorneys:

/s/ Beth M. Nussbaum
Emily E. Smith-Lee (BBO# 634223)
esmithlee@slnlaw.com
Beth M. Nussbaum (BBO#633878)
bnussbaum@slnlaw.com
Smith Lee Nebenzahl LLP
One Post Office Square
Sharon, MA  02067
781-784-2322
Dated: September 16, 2013                    781-793-0600 (facsimile)

## VERIFICATION

I declare and affirm, under the pains and penalties of perjury, that to the best of my knowledge the allegations set forth above are true and accurate.

John Doe

Dated: September 13 2013

CERTIFICATE OF SERVICE

I, Beth M. Nussbaum, Counsel for the Plaintiff, hereby certify that on September 16, 2013, the forgoing Amended Complaint, filed through the ECF system, will be sent by electronic mail to the registered participants and by first class mail to non-registered participants.


<u>/s/ Beth M. Nussbaum</u>